GABEL et al., Appellants,

v.

MIAMI EAST SCHOOL BOARD, Appellee.

[Cite as *Gabel v. Miami E. School Bd.,* 169 Ohio App.3d 609, 2006-Ohio-5963.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 2005–CA–41.

Decided Nov. 9, 2006.

610

Joseph P. Moore, for appellants.

Lynnette Pisone Ballato, for appellee.

———————

VALEN, Judge.

{¶ 1} Thomas and Christine Gabel appeal from the trial court's entry of summary judgment against them on their complaint challenging the Miami East School District's right to drain treated wastewater across their property and into a nearby creek.

{¶ 2} The Gabels advance four assignments of error on appeal. First, they contend that the trial court erred in finding that the school district may use an express easement for a "stormwater outfall sewer" to drain the treated wastewater. Second, they claim that the trial court erred in finding no unlawful taking of their property as a matter of law. Third, they argue that the trial court erred in finding the school board immune from liability on claims of nuisance and trespass. Fourth, they assert that the trial court erred in finding the existence of an implied easement allowing the school district to drain the treated wastewater.

{¶ 3} For the reasons set forth below, we believe the trial court erred in finding, as a matter of law, that the school district's drainage of treated wastewater across the Gabels' property fits within the scope of an express easement for a "stormwater outfall sewer." The language of the express easement does not unambiguously permit the school district to drain treated wastewater across the Gabels' property. To the contrary, the easement contains language limiting its use to "Storm Sewer purposes."

{¶ 4} Moreover, we find a triable issue of fact as to whether the drainage of treated wastewater on the Gabels' property was permissible because it imposed no additional burden on their land.

{¶ 5} We also conclude that the trial court erred in finding the existence of an implied easement to drain the treated wastewater across the Gabels' property. Although the school board alleges the existence of an implied easement by estoppel, we are unpersuaded that the Gabels took any actions that estop them from disclaiming the existence of an easement to drain the treated wastewater.

{¶ 6} Despite the foregoing conclusions, we agree with the trial court's determination that the Miami East School Board is immune from liability under R.C. 2744.02, as a matter of law, on the Gabels' nuisance and trespass claims. Therefore, the Gabels cannot prevail on these tort claims regardless of whether an easement authorizes the discharge of treated wastewater across their property.

{¶ 7} Finally, we conclude that the trial court erred in entering summary judgment against the Gabels on their mandamus claim alleging a taking of their property without just compensation. A trier of fact reasonably could find that the disputed drainage of treated wastewater across the Gabels' property is unauthorized and that it qualifies as a substantial or unreasonable interference with their property rights. Accordingly, the judgment of the Miami County Common Pleas Court is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

## I. Factual Background

{¶ 8} The Miami East School District long ago began operating a wastewater treatment facility on property located adjacent to land the Gabels now own. In 1958, a prior owner of the Gabels' land, Clark S. Bair, granted the school district an easement to "lay and perpetually maintain, operate, repair and remove a sewer line over and through [his] farm." The 1958 easement provided for the sewer line to be "laid in a direct line to Little Lost Creek." In accordance with this easement, the school district operated a 10,000–gallon wastewater facility for more than 40 years and discharged treated effluent through the sewer line and directly into the creek.

{¶ 9} In 1998, Jeffrey and Pamela Bair, who then owned the Bair property, granted the school district a second easement "for the installation, maintenance, repair, and replacement of a stormwater outfall sewer on, in, or under" their property. The 1998 easement stated that it was "for Storm Sewer purposes" and to provide "ingress and egress, maintenance and repair of a storm sewer outlet from the adjacent Miami East Board of Education property." Unlike the 1958 easement, the 1998 easement did not specify that it was to drain directly into

Little Lost Creek. Instead, the water was to drain onto a low-lying portion of the Bair property a short distance from the creek into which it ultimately would flow.

{¶ 10} Shortly after obtaining the 1998 easement, the school district approved resurfacing of a high school track on its property and the installation of a stormwater drainage system around the track. This work included the place-ment of a small drain on the Bair property using the 1998 easement. Thereafter, in 2003, the school district began building an elementary school on its property. The project included a new stormwater drainage system around the school, and it required the placement of a 36-inch cement drain on the Bair property under the 1998 easement.

{¶ 11} In conjunction with the foregoing construction project, the school district also built a new 25,000–gallon wastewater treatment facility on its land to replace the existing 10,000–gallon plant. The school district designed the new facility to discharge into a storm sewer on school property. From there, the treated effluent was to flow onto the Bair property through the stormwater outfall sewer that had been installed pursuant to the 1998 easement. The school district began using the new wastewater treatment facility in May 2004 and discontinued using its older facility at that time. Since then, the school district has used the 1958 sewer-line easement "only as a secondary stormwater outlet."

{¶ 12} The Gabels purchased the Bair property on August 18, 2004. They did not immediately notice that the school district was using the 1998 easement to drain stormwater and treated wastewater onto their property. A few weeks after buying the property, however, the Gabels discovered "a large amount of murky water" flowing from a drain pipe on their land. The water was located near Little Lost Creek in an area "covered by a large amount of underbrush" that Thomas Gabel had to "hack away" to find. The affected area allegedly includes several acres of the Gabels' property, which remains "continual[ly] saturated" due to treated wastewater being discharged there.

{¶ 13} The Gabels objected to the school district about the drainage of treated wastewater onto their property in December 2004. In response, the school district took the position that the drainage was permitted under the 1998 easement that it had obtained from Jeffrey and Pamela Bair. The dispute ultimately resulted in the Gabels filing a five-count verified complaint against the Miami East School District Board of Education. Count one alleged that the drainage of treated wastewater on their property was not permitted under the 1998 easement and constituted a taking of their property without just compensa-tion. As a result, the Gabels sought a writ of mandamus directing the school board to pay them for the taking. Counts two and three set forth tort claims of trespass and nuisance based on an allegation that the drainage of wastewater on

their property was not authorized by the 1998 easement. Count four alleged a violation of Ohio's public-records law based on the school board's failure to provide their attorney with certain information. Count five sought a preliminary injunction preventing further damage to the Gabels' property. The Gabels later dismissed counts four and five, however, leaving only the two tort claims and the takings issue remaining.

{¶ 14} The school board subsequently moved for summary judgment. In support, it argued that it was immune from tort liability. It also maintained that the school district possessed a valid express easement and/or an easement by estoppel permitting the discharge of treated wastewater onto the Gabels' land. Finally, the school board asserted that the drainage of treated wastewater under the 1998 easement did not constitute a compensable taking.

{¶ 15} In a November 23, 2005 decision and entry, the trial court agreed with the school board's arguments. It found that the school board was immune from tort liability under R.C. 2744.02. It also found that the Gabels' tort claims failed because the drainage of wastewater onto their property was permitted under the terms of the 1998 easement. The trial court additionally determined that the school district possessed an easement by estoppel permitting the drainage of treated wastewater across the 1998 easement. With regard to the takings issue, the trial court found that the land at issue had no economically viable use regardless of whether the school district drained treated wastewater on it. The trial court reached this conclusion because the low-lying area was covered with underbrush and located behind a football stadium near a creek where it already was subjected to the drainage of stormwater pursuant to the 1998 easement. Thus, the trial court reasoned that the additional drainage of treated wastewater in the area had no impact on the Gabels' ability to use the land. This timely appeal followed the trial court's entry of summary judgment against the Gabels.

## II. Analysis

{¶ 16} In their first assignment of error, the Gabels contend the trial court erred in finding that the 1998 easement authorized the school district to discharge treated wastewater onto their property. The Gabels argue that the 1998 easement is expressly limited to the discharge of stormwater.

{¶ 17} In reaching a contrary conclusion, the trial court reasoned:

{¶ 18} "The Gabels' contention that the Board cannot use the 1998 easement with the wastewater treatment plant is without merit. The easement is for the installation and maintenance of a storm sewer outfall or drain. (See Ex. A–1, attached to Defendant's Motion for Summary Judgment). There are no expressed instructions or limitations upon the use of that outfall. (Id.) The use of the outfall for treated wastewater drainage is not inconsistent with the use of a

stormwater outfall drain. The Gabels are simply arguing over the type of water being drained. There is no evidence of any non-compliance with the easement or EPA guidelines and permit requirements. There is no evidence of any environmental hazards, and there is no evidence which would indicate that the processed wastewater is any less clean than unprocessed stormwater. The Court makes no differentiation between unprocessed stormwater and processed wastewater."

{¶ 19} Upon review, we find the foregoing analysis to be unpersuasive. As noted above, the 1998 easement states that it is "for the installation, maintenance, repair, and replacement of a stormwater outfall sewer on, in, or under" their property. The easement also specifies that it is "for Storm Sewer purposes" and to provide "ingress and egress, maintenance and repair of a storm sewer outlet from the adjacent Miami East Board of Education property."

{¶ 20} "Stormwater" is commonly defined as "an abnormal amount of surface water due to a heavy rain or snowstorm."[1] An "outfall" is "[t]he place where a sewer, drain, or stream discharges."[2] A "sewer" is "[a]n artificial, usually underground conduit for carrying off sewage or rainwater."[3] With these definitions in mind, we believe a reasonable reading of the 1998 easement is that it was granted to the school district for purposes of transporting rain or snow-related surface water (or "stormwater") through an underground conduit (or "sewer") to a discharge point (or "outfall") on the Gabels' property. Because the 1998 easement specifies that it is for "Storm Sewer purposes," we cannot agree with the trial court's finding that there are no limitations imposed on its use. In our view, the school district's use of the 1998 easement to discharge treated wastewater, in addition to stormwater, onto the Gabels' property exceeded the express terms of the easement. Although the school board contends that the 1998 easement does not preclude the drainage of wastewater through the stormwater outfall sewer, we find this argument to be without merit. The most reasonable interpretation of a "stormwater outfall sewer" easement for "Storm Sewer purposes" is that it is limited to drainage of stormwater.[4]

---

1. Webster's New Millennium Dictionary of English, Preview Edition (v 0.9.6), retrieved from Dictionary.com.

2. The American Heritage Dictionary of the English Language, Fourth Edition, retrieved from Dictionary.com.

3. The American Heritage Dictionary of the English Language, Fourth Edition, retrieved from Dictionary.com.

4. Even assuming, arguendo, that the 1998 easement was ambiguous with regard to the school board's right to drain treated wastewater onto the Gabels' property, such ambiguity would not support the trial court's entry of summary judgment. When an easement is ambiguous as to its scope, a trial court may consider parol evidence to determine the parties' intent. *Gans v.*

{¶ 21} Unfortunately, the foregoing conclusion does not end our analysis of the easement issue. In its ruling, the trial court also correctly observed that the Ohio Supreme Court has approved new, nonspecified uses for express easements when those uses impose no additional burden on the servient estate. In *Friedman Transfer & Const. Co. v. Youngstown* (1964), 176 Ohio St. 209, 27 O.O.2d 91, 198 N.E.2d 661, for example, the court reviewed an easement granted to the government for the construction of a bridge. After the bridge had been completed, the government sought to install a water pipeline on it. Although the easement did not provide for the placement of a pipeline, the *Friedman* court concluded that it could be installed, without any compensation to the landowner, because it imposed no additional burden on the servient estate. Subsequently, in *Ziegler v. Ohio Water Serv. Co.* (1969), 18 Ohio St.2d 101, 47 O.O.2d 244, 247 N.E.2d 728, the court reviewed an easement granted to the government for highway purposes. The *Ziegler* court held that an underground water pipeline could be installed on the easement, again without compensation to the landowner, because the pipeline imposed no additional burden on the property.

{¶ 22} Thereafter, in *Jolliff v. Hardin Cable Television Co.* (1971), 26 Ohio St.2d 103, 55 O.O.2d 203, 269 N.E.2d 588, the court held that an easement granted to a power company "for the purpose of transmitting electric or other power" also could be used to run cable television lines across the grantor's property. In reaching this conclusion, the court noted that running cable television lines was similar to the use specified in the easement and that it imposed no additional burden on the servient estate. The *Jolliff* court also cited *Friedman* and *Ziegler*, observing that in both cases "the added uses, construction and maintenance of pipelines," were permitted despite the fact that they "were of an entirely different nature than the highway-purpose uses which were specified in the original grants." *Jolliff*, 26 Ohio St.2d at 108, 55 O.O.2d 203, 269 N.E.2d 588; see, also, *Centel Cable Television Co. v. Cook* (1991), 58 Ohio St.3d 8, 12, 567 N.E.2d 1010 (relying on *Friedman, Ziegler,* and *Jolliff* to hold that "the stringing of coaxial cable by a cable television company along an easement owned by a public utility constitutes no additional burden to the owner of the servient estate").

---

*Andrulis* (May 18, 2001), Portage App. No. 99–P–0118, 2001 WL 530490. In the present case, the record contains parol evidence in the form of affidavits from Jeffrey and Pamela Bair, the individuals who granted the 1998 easement to the school district. The Bairs both aver that the easement was granted specifically "for storm water runoff." They also aver that they did not intend to, and would not, grant the school district permission to discharge wastewater on their property via the 1998 easement. Finally, the Bairs aver that no one from the school district ever sought permission to use the 1998 easement for wastewater purposes. Thus, even if there were ambiguity in the 1998 easement, these affidavits would create a genuine issue of material fact as to whether the school district could drain treated wastewater onto the Gabels' property using that easement.

{¶ 23} Relying on the foregoing line of cases, the trial court concluded that the drainage of wastewater on the Gabels' property under the 1998 easement was permissible, as a matter of law, because it imposed no additional burden on their land. In reaching this conclusion, the trial court reasoned as follows:

{¶ 24} "The question in the case sub judice is not whether the wastewater treatment plant adds additional water to the Gabels' property. The question is whether the additional water imposes a substantial additional burden on the Gabels' use of the property. The [School] Board has two valid easements over the Gabels' property. One is for the installation of a stormwater sewer outlet, and the other is for a sewer line. The consolidation of the purified water and the stormwater through one outfall actually means that the school is not draining water onto the Gabels' property in two places. The water from the treatment plant does not make the natural drainway on the Gabels' property any less usable than it was with stormwater drainage. The Court has reviewed the photographs taken before and after the plant was operative. (See photographs attached as Ex. A–3 and A–4 to Defendant's Motion for Summary Judgment). The Court finds that the wastewater treatment plant has not imposed any additional burden on the Gabels' property. The property sits in a ravine and the Gabels have no evidence that there is any way they can use the property with only stormwater drained onto the property that is not available to them with the addition of clean, treated water. The Court finds that there has been no injury to the Gabels' premises in the way of hindering access thereto, particularly in light of the nature of the property."

{¶ 25} Although the issue is perhaps a close one, we believe that the trial court erred in finding, as a matter of law, that the discharge of treated wastewater on the Gabels' property under the 1998 easement imposed no additional burden on their land. Construing the evidence in a light most favorable to the Gabels, as we must in the context of summary judgment, we believe that a trier of fact reasonably might find otherwise. In its ruling, the trial court noted that the school district held two easements over the Gabels' land: the 1958 easement, which indisputably provided for the drainage of treated wastewater, and the 1998 easement, which was for storm sewer purposes. The trial court reasoned that no additional burden resulted from the school district's decision to discontinue using the 1958 easement and to drain treated wastewater *and* stormwater onto the Gabels' property under the 1998 easement.

{¶ 26} If the drain pipes installed under both easements discharged directly into the creek on the Gabels' land, we would be inclined to agree with the trial court's analysis. As noted above, however, the drain pipe installed under the 1958 easement discharges directly into the creek, whereas the pipe installed under the 1998 easement discharges onto a low-lying portion of the Gabels' land

near the creek but not directly into it. As a result, the Gabels aver that the drainage of both treated wastewater and stormwater using the 1998 easement has resulted in a considerable amount of standing water on their property that would not exist if the 1998 easement were used solely for stormwater purposes. In support of this proposition, Thomas Gabel provided the trial court with an affidavit in which he averred that several acres of his property are affected by the school district's use of the 1998 easement to drain treated wastewater. He averred that the area is continually saturated and that it contains a "large amount of murky water." The Gabels also provided the trial court with a videotape of the area. Among other things, it shows a large pool of water in a wooded portion of their land. Finally, the Gabels provided the trial court with an affidavit from David Winemiller, a licensed engineer and land surveyor. Winemiller averred:

{¶ 27} "a. The added use of the wastewater treatment plant that utilizes the storm water fallout sewer by the Miami East School Board creates an extreme amount of water. The volume of water is attributable to the volume of water generated by the wastewater treatment plant operated by the Miami East School Board.

{¶ 28} "b. The continual use of the wastewater treatment plant by the Miami East School Board creates a substantial burden on the Gabels' property. The wastewater remains in a stagnant pool on the Gabels' property and fails to drain directly into Lost Creek.

{¶ 29} "c. If the wastewater treatment plant were not being operated by the Miami East School Board, then the amount of water on the Gabels' property would be significantly less."

{¶ 30} In light of the foregoing evidence, we believe that a genuine issue of material fact exists as to whether the drainage of wastewater under the 1998 easement imposes an additional burden on the Gabels' land beyond the burden created by using the easement for stormwater purposes. As a result, the school board was not entitled to summary judgment on the basis that the drainage of wastewater under the 1998 easement imposed no additional burden and, therefore, was permissible despite the fact that it was not specifically authorized under the terms of the easement.

{¶ 31} We turn next to the trial court's alternative finding that the school district held an implied easement by estoppel permitting it to use the 1998 stormwater outfall sewer for the drainage of wastewater. In support, the trial court reasoned:

{¶ 32} "The [School] Board relied upon the easement to build the wastewater treatment plant on the Bairs' property line. All were aware at the time of the creation of the easement that the Board would be developing the property. The

use of the stormwater outfall for the wastewater treatment plant was open and obvious before the Gabels purchased the property. Additionally, the Supreme Court has held that the principle of caveat emptor applies to sales of real estate relative to observable conditions. *Layman v. Binns,* 35 Ohio St.3d 176 [519 N.E.2d 642] (1988). This means that the Board has an implied easement to use the stormwater outfall with the wastewater treatment plant, and the Gabels are estopped from arguing otherwise."

■■ {¶ 33} Upon review, we disagree with the trial court's analysis. " 'One claiming an easement by estoppel must establish (1) misrepresentation or fraudulent failure to speak and (2) reasonable detrimental reliance.' " *Maloney v. Patterson* (1989), 63 Ohio App.3d 405, 410, 579 N.E.2d 230, quoting Bruce & Ely, The Law of Easements and Licenses in Land (1988), Section 6.01. We note, however, that " '[c]ourts are reluctant to find an easement by estoppel on the basis of "mere passive acquiescence." Nonetheless, under certain circumstances, equity imposes an obligation to disclose information regarding the existence or location of an easement. Such a duty may be found when the servient estate owner observes the claimant improving the servient estate, but not usually when the servient estate owner stands by while the claimant improves his own property, the alleged dominant estate. Furthermore, there is authority that an obligation to speak does not arise when a claimant is already in possession of the relevant information.' " Id.

{¶ 34} Consistent with the trial court's findings, the school board argues that an easement by estoppel arose when Jeffrey and Pamela Bair, the former owners of the property, remained silent and watched the School District expend funds to build a new school and wastewater treatment facility in anticipation of using the 1998 easement to drain treated wastewater across their property. Thus, the school board asserts that the Bairs failed to speak out against the planned use of the 1998 easement to drain treated wastewater and that the school district detrimentally relied on their silence.

■ {¶ 35} The problem with the estoppel argument is that nothing in the record establishes the Bairs' *knowledge* of the school district's intent to use the 1998 easement to drain treated wastewater prior to completion of the construction project. Although the building of the new school and wastewater treatment facility was public knowledge, Jeffrey and Pamela Bair both averred that no one from the Miami East School District ever approached them about using the 1998 easement for wastewater drainage purposes. Moreover, at the time of the construction project, the school district already held a 1958 easement for the drainage of treated wastewater across the Bairs' property at a different location. Consequently, it would have been reasonable for the Bairs to assume that the School District would continue to use this easement for the drainage of treated

wastewater from the new facility. Indeed, even the school board's own expert, Ohio EPA environmental specialist Joseph Reynolds, opined that during the permitting process, he believed the new wastewater treatment facility would drain through the old system. In any event, nothing in the plans for the project showed the new facility draining onto the Bairs' property using the 1998 easement, and nothing in the record demonstrates the Bairs' knowledge of any such intent. As a result, their silence in the face of the construction project does not support the existence of an easement by estoppel.[5] Therefore, the trial court erred in entering summary judgment in favor of the school board on the basis that the school district held an implied easement to drain treated wastewater using the 1998 stormwater outfall sewer.

{¶ 36} Our analysis up to this point is somewhat academic, however, in light of our agreement with the trial court's additional finding that the school board is immune from liability on the Gabels' claims of nuisance and trespass. Under R.C. 2744.02(A)(1), political subdivisions are immune from tort liability "allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."[6] This broad grant of immunity is subject to five exceptions set forth in R.C. 2744.02(B). The second of these exceptions is at issue here. It provides that political subdivisions are liable for "loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions." R.C. 2744.02(B)(2).

{¶ 37} The issue in the present case is whether the Gabels' tort claims of nuisance and trespass arise from the negligent performance of a proprietary function by school district employees. Based on our review of the record, we find no evidence to support such a conclusion. Under R.C. 2744.01(C)(2)(*l*), the design, installation, or construction of a sewer system is classified as a governmental function. On the other hand, R.C. 2744.01(G)(2)(d) provides that the maintenance or operation of a sewer system is a proprietary function. On appeal,

---

5. Parenthetically, we note that it is questionable whether governmental entities ever may obtain an easement by estoppel. This is so because "governmental entities have the alternative of eminent domain to acquire the necessary land * * *. A private person asserting estoppel does not." *Maloney*, 63 Ohio App.3d at 411, 579 N.E.2d 230.

6. The Gabels have not disputed that the school board qualifies as a "political subdivision" under R.C. Chapter 2744. A political subdivision is defined in R.C. 2744.01(F) as a "municipal corporation, township, county, *school district*, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." (Emphasis added.) Under this definition, the Miami East School District is a political subdivision. But because the Miami East School Board is an instrumentality that carries out the functions of its school district, the potential immunity from tort liability provided to political subdivisions under R.C. Chapter 2744 extends to the school board as well. Cf. *Brewer v. Butler Cty. Bldg. & Zoning Dept.* (2001), 142 Ohio App.3d 567, 573, 756 N.E.2d 222.

the Gabels argue that their nuisance and trespass claims are grounded in the negligent performance of a propriety function, namely, the School District's operation of its new wastewater treatment facility. They assert that the new plant is being operated in a way that results in the unauthorized drainage of wastewater on their property at the site of the 1998 stormwater easement.

{¶ 38} Upon review, we find no error in the trial court's determination that the school board is immune from liability on the Gabels' tort claims. The trial court properly noted that the school board has immunity insofar as the tort claims might be read as arising from the design of the new wastewater treatment facility. Because the design of the facility is a governmental function under R.C. 2744.01(C)(2)(*l*), the immunity exception set forth in R.C. 2744.02(B)(2) would have no applicability.

{¶ 39} As noted above, however, the Gabels contend that their tort claims involve the negligent operation of the new wastewater treatment facility, which has resulted in the unauthorized discharge of water on their property. If the record contained evidence establishing negligent operation of the plant by school district employees, we would find the Gabels' argument to be persuasive. But the record is devoid of evidence linking the excess water on their property to *negligence* in the operation of the wastewater treatment facility. To the contrary, the record reflects that the facility is being operated exactly as planned and intended. The plant was specifically designed to discharge treated wastewater onto the Gabels' property at the site of the 1998 stormwater easement, and that is precisely what is happening. Thus, we find no genuine issue of material fact as to whether the excess wastewater on the Gabels' property is attributable to the negligent operation of the new wastewater treatment facility.[7]

{¶ 40} Because the discharge of treated wastewater on the Gabels' property was the intended result of the School District's actions, R.C. 2744.02(B)(2)does not apply. As set forth above, that provision removes the shield immunity when harm results from the negligent performance of a proprietary function. Absent evidence of such negligence, political subdivision immunity remains intact. See, e.g., *Thayer v. W. Carrollton Bd. of Edn.*, Montgomery App. No. 20063, 2004-Ohio-3921, 2004 WL 1662198, ¶ 14 (recognizing that the exceptions to immunity

---

7. In connection with the trespass claim, the Gabels' complaint does not even allege the existence of negligence. It alleges harm resulting from "the intentional acts of Defendant." With regard to the nuisance claim, the Gabels do allege unspecified acts of negligence. As we have explained above, however, the summary judgment evidence does not support a finding of negligence. Instead, the only reasonable conclusion is that the School District intended to bring about the conditions alleged by the Gabels to constitute a nuisance. In such a case, "[w]here the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, the law of negligence has no application[.]" *Angerman v. Burick*, Wayne App. No. 02CA0028, 2003-Ohio-1469, 2003 WL 1524505, ¶ 13.

found in R.C. 2744.02(B) apply "where injury results from negligence" rather than intentional acts); *Reno v. Centerville,* Montgomery App. No. 20078, 2004-Ohio-781, 2004 WL 316512, ¶ 51 (observing that political subdivisions are immune from liability for intentional tort claims for trespass). Consequently, we find no error in the trial court's entry of summary judgment against the Gabels on their tort claims alleging nuisance and trespass. The school board is immune from liability on these claims under R.C. 2744.02, and we find no genuine issue of material fact as to whether a statutory exception applies. Therefore, the Gabels cannot prevail on the tort claims regardless of whether the 1998 easement authorized the discharge of treated wastewater across their property.

{¶ 41} The final issue before us is whether the trial court erred in entering summary judgment against the Gabels on their mandamus claim alleging a taking of their property without just compensation. "The United States and Ohio Constitutions guarantee that private property shall not be taken for public use without just compensation." *State ex rel. Elsass v. Shelby Cty. Bd. Of Commrs.* (2001), 92 Ohio St.3d 529, 533, 751 N.E.2d 1032. "In order to establish a taking, a landowner must demonstrate a substantial or unreasonable interference with a property right. Such an interference may involve the actual physical taking of real property, or it may include the deprivation of an intangible interest in the premises." (Citations omitted.) *State ex rel. OTR v. Columbus* (1996), 76 Ohio St.3d 203, 206, 667 N.E.2d 8.

{¶ 42} The Ohio Supreme Court has recognized that " '[t]he value of property consists in the owner's absolute right of dominion, use, and disposition for every lawful purpose. This necessarily excludes the power of others from exercising any dominion, use or disposition over it. Hence, any physical interference by another, with the owner's use and enjoyment of his property, is a taking to that extent.' " Id. at 207, 667 N.E.2d 8, quoting *Mansfield v. Balliett* (1902), 65 Ohio St. 451, 63 N.E. 86; see, also, *Smith v. Erie R. Co.* (1938), 134 Ohio St. 135, 142, 11 O.O. 571, 16 N.E.2d 310 (recognizing that "[i]n Ohio * * * compensation has been allowed * * * for the casting of extraneous and annoying substances on the owner's land"); *State ex rel. Livingston Court Apts. v. Columbus* (1998), 130 Ohio App.3d 730, 735, 721 N.E.2d 135 ("A long line of Ohio Supreme Court cases holds that a taking may result where sewage or storm water from a governmental authority causes damage to a property owner").

{¶ 43} In *Lucas v. Carney* (1958), 167 Ohio St. 416, 5 O.O.2d 63, 149 N.E.2d 238, the court concluded that a viable takings claim existed when the construction of a public improvement on county property greatly increased the flow of water on the plaintiff's property. The *Lucas* court held:

{¶ 44} "Where, in creating a public improvement upon land which it owns, a county without negligence or malice but solely as a result of the creation of such

improvement physically encroaches upon the land and property of another owner and deprives that owner of any of the use and enjoyment of his property, such encroachment is a taking pro tanto of the property so encroached upon, for which the county is liable, and the owner of such property is entitled to institute an action and have a jury impaneled to determine the compensation due him from the county for the appropriation pro tanto of his property." Id., syllabus.

{¶ 45} Likewise, in *Masley v. Lorain* (1976), 48 Ohio St.2d 334, 2 O.O.3d 463, 358 N.E.2d 596, the court recognized that any direct encroachment on land subjecting it to a public use that restricts the owner's dominion and control over the land constitutes a taking. In *Masley,* which also involved the drainage of water across the plaintiffs' property, the court concluded:

{¶ 46} "The construction and operation of a municipal storm sewer system so as to cause material damage to a downstream landowner, as a result of flooding from rains or other causes which are reasonably foreseeable, is a direct encroachment upon that land which subjects it to a public use that excludes or restricts the landowner's dominion and control over his land, and such owner has a right to compensation for the property taken under Section 19, Article I of the Ohio Constitution." Id., syllabus.

{¶ 47} The foregoing cases illustrate that one of the fundamental attributes of land ownership is the right to exclude others from use of the land. They also establish that when the government's unauthorized encroachment on private land interferes with the owner's use and enjoyment of his property, a potential takings claim arises. In the present case, however, the trial court concluded that no taking occurred, as a matter of law, despite the school district's discharge of treated wastewater on the Gabels' property, because the evidence failed to establish any "economically viable use" for the land. In support, the trial court reasoned:

{¶ 48} "The Gabels acknowledge that the Board's use of the easement for purposes of stormwater drainage was and is lawful. (See Complaint, ¶ 17.) Accordingly, the Gabels must demonstrate that there is an economically viable use of the property, in light of the Board's right to drain stormwater on the property, in light of the fact that the property is covered with underbrush, in light of the fact that the property sits in a low lying area behind a football stadium and is shown to have had a history of flooding, and in light of the fact that the property borders Lost Creek. The Court finds that flooding is flooding, whether it is stormwater drainage flooding or wastewater treatment plant flooding. The Gabels' bare assertion that the property is currently useless, is insufficient to meet their burden of showing that it is the wastewater treatment plant that causes it to be useless."

{¶ 49} On appeal, the school board similarly argues that the Gabels cannot establish a taking without evidence that the drainage of treated wastewater on

their land interferes with "some economically viable use of their property." Because the record fails to show that the wooded area at issue had any economically viable use, the school board contends it cannot be liable for a taking.

{¶ 50} Upon review, we disagree with the trial court's analysis and the school board's argument. It is true that a taking may exist when government action deprives a property owner of *some*, or in certain cases *all*, economically viable use of his land. See *State ex rel. BSW Dev. Group v. Dayton*, 83 Ohio St.3d 338, 699 N.E.2d 1271 (1998) (recognizing that in cases involving regulatory takings, a landowner must prove the deprivation of all economically viable uses of his land); *State ex rel. Elsass*, 92 Ohio St.3d at 535, 751 N.E.2d 1032 (observing that in nonregulatory takings cases, the deprivation of any economically viable use of land is sufficient to constitute a taking).

{¶ 51} It is also true, however, that the government sometimes takes property that has no "economically viable use" other than for private residential purposes.[8] The school board's argument suggests that portions of the Gabels' residential land may be taken for public use, without any compensation being paid, because the land has no other economically viable use. We do not agree. Under the school board's theory, it could flood the Gabels' wooded property completely, or possibly even confiscate the land outright, because it has no "economically viable use" anyway. But the existence of economic viability, a concept that traditionally has applied in regulatory takings cases, cannot be the linchpin of takings analysis in all cases.

{¶ 52} To the contrary, as the cases cited above make clear, a compensable taking is established if a landowner simply demonstrates a substantial or unreasonable interference with a property right. These rights include the owner's absolute right of dominion, use, and disposition of his property for every lawful purpose. It includes the right to exclude others from exercising any dominion, use, or disposition over it. As a result, " 'any physical interference by another, with the owner's use and enjoyment of his property, is a taking to that extent.' " *State ex rel. OTR*, 76 Ohio St.3d at 207, 667 N.E.2d 8, quoting *Mansfield v. Balliett* (1902), 65 Ohio St. 451, 63 N.E. 86. This is particularly true in cases involving the physical invasion of private property through flooding caused by public improvements. *State ex rel. Elsass*, 92 Ohio St.3d at 536, fn. 1, 751 N.E.2d 1032.

{¶ 53} In the present case, the Gabels' intended use and enjoyment of their land might consist of nothing more than taking leisurely walks through their

---

8. For example, if the government appropriates a portion of purely residential property for a public use, the landowner usually remains capable of living in his home. Yet, he undoubtedly is entitled to compensation for the portion of his land taken, despite the fact that he has not shown the deprivation of any "economically viable use."

woods. To the extent that the school district's discharge of treated wastewater creates pools of stagnant water and flooding that otherwise would not exist, a trier of fact reasonably might find interference with the Gabels' right to the exclusive dominion and control over their property. As noted above, the Gabels have averred that the drainage of both treated wastewater and stormwater using the 1998 easement has resulted in a considerable amount of standing water on their property that would not exist if the 1998 easement were used solely for stormwater purposes. In particular, Thomas Gabel provided the trial court with an affidavit in which he stated that *several acres* of his property are affected by the school district's use of the 1998 easement to drain treated wastewater. Moreover, engineer David Winemiller averred that use of the 1998 easement to drain treated wastewater across the Gabels' land has resulted in a "stagnant pool" and an "extreme amount of water" on the property. In his view, the amount of standing water on the Gabels' land would be "significantly less" if the new wastewater treatment plant were not being discharged at the site of the 1998 easement. In light of this evidence, we find a genuine issue of material fact as to whether the discharge of treated wastewater, if ultimately found to be unauthorized,[9] has resulted in a compensable taking. Finally, we find no merit in the school board's argument that no taking can exist because the Gabels continue to own the land at issue. The school board cites no authority for the proposition that it must assert actual ownership of the land for a taking to occur. As the case law cited herein makes clear, a taking can arise if a property owner demonstrates interference with a property right, including the right to exclusive use and enjoyment of his land.

## III. Conclusion

{¶ 54} Based on the reasoning set forth above, the judgment of the Miami County Common Pleas Court is hereby affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BROGAN and WOLFF, JJ., concur.

---

9. As set forth in our analysis of the easement issue, supra, there remains a triable issue as to whether the drainage of treated wastewater under the 1998 easement imposes an additional burden on the Gabels' land beyond the burden created by using the easement solely for stormwater purposes. If the school district's use of the 1998 easement for wastewater purposes does impose an additional burden on the Gabels' land, then that use is unauthorized and a potential taking exists.

ANTHONY VALEN, J., retired, of the Twelfth District Court of Appeals, sitting by assignment.