SEILER et al., Appellants,

v.

CITY OF NORWALK, Appellee.

[Cite as *Seiler v. Norwalk*, 192 Ohio App.3d 331, 2011-Ohio-548.]

Court of Appeals of Ohio,
Sixth District, Huron County.

No. H–10–008

Decided Feb. 8, 2011.

Leslie O. Murray and John T. Murray, for appellants.

Teresa L. Grigsby and Joan C. Szuberla, for appellee.

---

Cosme, Judge.

{¶ 1} Plaintiff-appellants, Marilyn Seiler, Gary and Cathy McGinn, Bonnie and Richard Barna, Margaret Miller, and Fred Boubek, appeal the judgment of the Huron County Common Pleas Court granting the city of Norwalk's motion for summary judgment and denying appellants' motion for summary judgment. The denial of a motion for summary judgment is not a final, appealable order. *State ex rel. Overmeyer v. Walinski* (1966), 8 Ohio St.2d 23, 37 O.O.2d 358, 222 N.E.2d

312. To the extent that appellants' arguments urge reversal of the denial of their motion for summary judgment, those arguments will not be addressed.

{¶ 2} Appellants brought this action against the city of Norwalk ("the city"), asserting claims for negligence, trespass, and nuisance, as well as a claim for a writ of mandamus compelling the city to initiate appropriation proceedings regarding the taking of appellants' properties, which are all adjacent to Norwalk Creek, near Elm Street, in Norwalk, Ohio.

{¶ 3} Appellants complain that their properties flooded on June 22, 2006, following a storm event and have flooded frequently thereafter as a result of the city's improper management of the municipal water system.

{¶ 4} Upon consideration of the assignments of error, we conclude that the city is a political subdivision subject to sovereign immunity. However, the alleged harm occurred in connection with a proprietary function, the operation of a municipal water system. The defense of immunity claimed by the city under R.C. 2744.03(A)(3) and (5) does not apply in this case. Because genuine issues of material fact exist on the tort claims, neither the city nor appellants are entitled to summary judgment as a matter of law.

{¶ 5} We find that the trial court further erred in holding that the defense of immunity also extended to appellants' writ of mandamus. The trial court must determine whether the city appropriated appellants' properties as a result of its operation of the gated spillway.[1]

{¶ 6} For the foregoing reasons, we reverse.

## I. BACKGROUND

{¶ 7} The city's water system includes three reservoirs, the upper, lower, and Memorial reservoirs. The reservoirs are earthen dams built in line with Norwalk Creek and were constructed to supply drinking water for the city and cooling water for the city's power plant. The lower reservoir was built about 1900 as an "on-stream" reservoir. The upper reservoir was built downstream of the lower before 1913. Its spillway diverted Norwalk Creek into the next tributary to the southwest, essentially converting the lower reservoir into an off-channel storage reservoir. The Memorial reservoir was built in 1952.[2] The reservoirs are located east of the city and lie within the Norwalk Creek watershed.

---

1. In this case, appellants use the term "sluice gates," while the city uses the term "gated spillway," in referring to the same thing. In order to avoid confusion, we refer to the "sluice gates" as the "gated spillway."

2. According to Lawson, the Memorial reservoir was built in 1952. The 1977 Ohio Department of Natural Resources ("ODNR") report, however, claims that the Memorial reservoir was built in 1954.

{¶ 8} The upper and lower reservoirs do not discharge water directly to Norwalk Creek. Runoff can leave the reservoirs through Memorial reservoir via the ungated spillway, the gated spillway, or the emergency spillway. The ungated spillway is a 200–foot long concrete broad-crested weir on the west end of the reservoir that was installed when the reservoir was constructed. The gated spillway, added in 1963, consists of two 12–foot wide by 7–foot high tainter gates (also called radial gates) on the west end of the reservoir, approximately 270 feet south of the ungated spillway. The emergency spillway is a 243.4–foot long low grassy embankment on the southwest corner of the reservoir. It was installed in 1971 and enlarged in 2002 to its current size.[3] It is designed so that if the water in the reservoir gets too high, it will overtop the emergency spillway so that the reservoir does not fail. The emergency spillway has never been overtopped.

{¶ 9} Norwalk Creek has a naturally occurring floodplain along its length. The regulatory floodplain, however, was not designated until February 1979, when hydrologic and hydraulic studies and models were used to determine base flood elevations (100–year water-surface elevations). Appellants' properties are located within the regulatory floodplain, below the 100–year base flood elevation and the 10–year base flood elevation.

{¶ 10} Appellants maintain that the city's negligence in operating the municipal water system was and continues to be the proximate cause of the flooding of their properties. Appellants insist that the city's current water system is inadequate and in need of repair, but that the city has failed to take any action to maintain and operate it in a manner that does not increase the risk of flooding to downstream property owners.

{¶ 11} The parties' experts disagree on the proximate cause of the flooding of appellants' properties. Robert Haag of Haag Environmental Company submitted a report on behalf of the appellants. Julie Lawson of ARCADIS US, Inc. submitted a report on behalf of the city.

{¶ 12} Haag claims that the natural flow of Norwalk Creek has been altered. Lawson disagrees. The two experts point to different factors in support of their arguments, and both interpret those factors differently. The determinative issue is whether the rate of water flowing through the reservoirs has increased as a result of the operation of the gated spillway during periods of heavy rain. The subsequent issue is whether the increased rate of flow from the reservoirs proximately caused appellants' properties to flood.

---

3. The 1977 ODNR report, however, describes this spillway as being 400 feet long.

{¶ 13} The city questions Haag's expertise, noting that Haag is not an engineer. Haag holds a degree in geology and a master's degree in engineering geology from the University of Michigan and describes himself as a hydrogeologist and an engineering geologist, the former concerning the study of water and the latter concerning the engineering topics that relate to the flow of water. Haag also relies upon his prior work on other projects involving dams and the study of the flow of water—the hydraulic and hydrologic principles that are crucial to the determination of whether the flooding of appellants' properties was proximately caused by the city's negligent operation of the gated spillway.

{¶ 14} Haag's report alludes to defects in the design and construction of the city water system. He asserts that the reservoirs changed the natural flow of Norwalk Creek, that the addition of the Benedict Avenue Bridge (and other bridges and obstructions over Norwalk Creek) obstructed the flow of the creek, causing backwater, and that the city's operation of the gated spillway during heavy rainfall in June 2006 resulted in the flooding of appellants' properties. He questions why the city chose to build in-line dams as opposed to stand-alone dams. In addition, he questions the failure of the city to consider re-routing the reservoir outflow around the city and its failure to consider flood-prevention measures at that time and since.

{¶ 15} In particular, Haag challenges the city's claim that the flow of water through Norwalk Creek is "natural." He compared the design and construction of the reservoirs with other dams across natural streams that he has experienced first hand, suggesting that the maintenance of the water level within the reservoirs is more complex than the dams he has knowledge of. He also compared the city's reservoirs to bank-side reservoirs, or stand-alone reservoirs, such as those in Findlay and Fostoria. In comparing the two, Haag suggests that the city erred by building the reservoirs. Haag insists that the reservoirs compounded the risk of flooding by combining the effluent of other streams, and runoff from the watershed, thereby altering the natural flow of the creek. He also suggests that the reservoirs store and release water at a different rate from that of a natural stream during a storm event. Haag emphasizes the influence of man-made obstructions, such as the Benedict Avenue Bridge, upon backwater.

{¶ 16} Appellants' claims, however, do not arise out of the alleged faulty design or construction of the reservoirs. Haag insists that the absence of frequent, severe flooding prior to the June 2006 storm event is evidence that the reservoirs have been improperly maintained and operated. According to Haag, appellants did not suffer from severe or repeated flooding prior to June 2006. Haag visited the area, conducted interviews of property owners along Elm Street, and reviewed city documents relating to the operation of the city's water system and historical records. Haag noted that structures currently owned by appellants

that were built as early as 1900 remain standing in the floodplain. The McGinn house was built in 1900, the Barna house in 1920, the Seiler house in 1930, and the Doubek and Miller houses in 1943. Haag suggests that if flooding along Elm Street had been repeated and severe since the homes were built, they would no longer be standing. In the Seiler home, a working furnace that was more than 20 years old showed no evidence of being touched by water prior to 1986. The McGinn home had previously flooded only when the reservoir itself was breached in 1969.

{¶ 17} Haag concludes that the increase in flooding and its severity can be attributed to the maintenance and operation of the reservoirs, including the gated spillway and downstream obstructions, which cause backwater. Haag relies in part on the deposition testimony of Richard Brown, retired superintendent of the city's water and wastewater treatment plant. Brown acknowledged that the gated spillway can be used to control the flow of water and thus prevent the reservoirs from overtopping. Haag contends that because of this ability to control the outflow of water from the reservoirs, the city had an obligation to develop an operation-and-maintenance policy considering the effects of the release of its water upon the downstream property owners. Haag insists that the city failed to take into consideration the effect of the release of water from the gated spillway upon the downstream property owners and the likelihood that appellants' properties would flood.

{¶ 18} Lawson is a hydraulics engineer who also relies upon her education, training, and involvement in the study of various watersheds and flooding events to perform hydraulic analysis and evaluate flooding issues. Lawson draws upon ARCADIS's prior involvement in studies of the Norwalk Creek watershed, other flooding studies performed in the Norwalk Creek watershed, and projects involving the design and construction of the city's water system, including the reservoirs. Lawson contends that her report is more comprehensive than Haag's in part because ARCADIS had prepared a report following the 2006 flood that examined the effects to the base flood elevation, if any, from the changes to the Norwalk Creek floodplain since the 1978 Flood Insurance Study was completed and to determine potential improvements that could reduce the future probability and severity of flooding. Lawson incorporated this 2007 Norwalk Creek Watershed Study into her report. In addition, Lawson contends that she reviewed the complaints, depositions, exhibits, and Haag's report, and "performed additional research topical to this case and completed additional hydraulic analysis."

{¶ 19} In her report, Lawson insists that the reservoirs, the use of the gated spillway, and the addition of the Benedict Avenue Bridge did not contribute to the flooding of appellants' properties. According to Lawson, three things affect

the flood elevation and the size of the floodplain: (1) quantity of flow in the river, (2) downstream obstructions (which cause backwater), and (3) topography.

{¶ 20} As to the first factor, Lawson asserts that the peak flow rate is unchanged. According to Lawson, the peak flow rate of water entering a reservoir is greater than the peak flow rate of water leaving a reservoir. The lower peak rate results in lower downstream water elevations. Lawson contends that "[w]hen the storm events are too large for the reservoir to have a positive impact, it becomes a neutral impact, not influencing the peak flow rate at all. The flood water simply passes through Norwalk Reservoirs. The city is not adding flow to what nature produces."

{¶ 21} As to the second factor, Lawson insists that the construction of the Benedict Avenue Bridge did not cause a downstream obstruction and that the reservoirs could not produce backwater downstream at East Elm Street.

{¶ 22} Regarding the third factor, Lawson asserts that the topography in the area of East Elm Street has not changed at least since the first house on Elm Street was constructed. In a previous study, ARCADIS concluded that appellants' properties lie in a particularly low area of East Elm Street, with hills to the northeast and southwest. According to ARCADIS's study of historic topographic maps from 1915, the topography of the Norwalk Creek watershed has not changed.

{¶ 23} Lawson suggests that appellants' property damage was caused solely by excessive rainfall and was not related to any negligence on the part of the city. Lawson asserts that the June 21–22, 2006 storm exceeded the 100–year event and the precipitation generated by this storm was an important factor that contributed to the flooding problems. The rain gauge at the city wastewater plant recorded 5.42 inches of rainfall in a 24–hour period during this storm. According to Lawson, a 100–year storm produces 5.07 inches of rain in 12 hours. Lawson does not, however, address the discrepancy in the duration of the rainfall of the 2006 storm versus a 100–year storm.

{¶ 24} As evidence that the 2006 storm was an extraordinary event, Lawson asserts that it produced the third-highest crest, 23.95 feet, downstream at Milan, on the Huron River, into which Norwalk Creek flows. The second-highest crest at Milan was recorded on January 22, 1959. No information is provided concerning the amount of rainfall generated by the 1959 storm, which occurred when the ground within the watershed was frozen.

{¶ 25} The highest crest at Milan was recorded on July 5, 1969, shortly after the city's lower reservoir was breached. The 1969 storm produced 11 inches of rainfall in 12 hours, more than twice as much precipitation as a 100–year storm. During the 1969 storm, the Huron River crested at Milan at 31.10 feet, or 7.15

feet higher than during the 2006 storm. The sudden discharge of water from a breach of the lower reservoir in 1969 may have also contributed to the flooding and the high recording at Milan.

{¶ 26} There is no evidence that the 1959 storm caused any flooding, despite the fact that the runoff and precipitation generated was sufficient to cause the second-highest crest of the Huron River at Milan. In comparison, the cumulative rainfall of only 1.12 inches, 1.84 inches, and 0.96 inches over a three-day period in February 2008 was sufficient to cause flooding of appellants' properties. On the last day of that storm, February 7, 2008, the crest at Milan was 21.85 feet, the sixth-highest crest recorded.

{¶ 27} Lawson further argues that the storage capacity of the reservoirs is insufficient to provide flood relief for storms such as the 2006 storm because the "amount of storage would not be expected to alleviate downstream flooding concerns. In any case, it would not result in increased flooding downstream." Brown testified that even if the reservoirs had been empty prior to the 2006 storm event, the flooding would still have occurred.

{¶ 28} The Ohio Department of Natural Resources ("ODNR"), which regulates reservoirs, investigated the adequacy of the spillway systems of the Norwalk reservoirs in a 1977 report. It based its calculations on a storm identical to the 1969 storm. The ODNR routing analysis showed that there would be only a 3 percent reduction in peak flow for Memorial reservoir for this storm event. The peak flow passing through the reservoir would be reduced from 5,090 cubic feet per second to 4,940 cubic feet per second. According to Lawson, this "demonstrates that storage provided from reservoirs can impact water surface elevations downstream by decreasing them, not increasing them."

{¶ 29} The ODNR study, however, focused only on rain events, how much water was coming into the reservoirs, and how it can be passed through without damaging the reservoirs. It looked only at the amount of water generated and potentially stored, not the effect of the release of water. ODNR was concerned with the stability of the reservoir and its ability to withstand a flood based on a 100–year storm. The purpose of the study was to ensure that the rainwater from such a storm would flow entirely through the spillway rather than over the top of the reservoir. The function of the principal spillway and the emergency spillway was to prevent destruction of the earthen reservoir and catastrophic flooding.

{¶ 30} According to Haag, the storage capacity of the reservoirs is irrelevant. Haag does not disagree with Lawson and the city that the reservoirs offer some storage. The effect of this storage capacity, however small, is a reduction of the rate at which water leaves the reservoir, compared to the rate at which water enters the reservoir. Haag contends, however, that this effect is true only when the position of the gated spillway is not changed during a rain event. Haag

claims that opening the gated spillway after the water level has already surpassed its height significantly increases the flow of water in a short amount of time, resulting in higher downstream elevations. It was this action that appellants contend caused the flooding of their properties.

{¶ 31} A March 9, 2001 memorandum from Brown reflects that the city knew it could control the rate at which water was released from the reservoir and that the rate at which water was released could result in flooding downstream. It also reveals that the city had, in the past, tried to manage water supply versus flood control through the operation of the gated spillway. In the 1970s, the city settled on a combination of the ungated spillway and gated spillway left partially open, to maintain the water levels in the reservoir at 30 inches below the top of the reservoir. During Brown's tenure, he made an effort to manage the level of water in the reservoir in an effort to minimize flooding downstream. However, it is clear that Brown was under pressure to keep water levels high and to preserve the water supply.

{¶ 32} In 1991, automatic valve actuators were installed on the gated spillway, and water-level monitors were added downstream to permit the "control and monitoring" of the water levels from the waste-water treatment plant. At that time, the city would typically keep the water levels in the reservoir at 20 inches below the top of the reservoir. Operators were instructed to open the gate at 15 inches below the top of the reservoir and let water out at "whatever rate to prevent overflow of either Norwalk Creek or the big spillway on Memorial."

{¶ 33} Brown indicated that the reservoirs were maintained in the early spring of 2001 at 65 inches below the top of the reservoir because of expected snow melts and spring rains. According to Brown, it would have been "irresponsible" to fill the reservoir to capacity, which was desired by some in order to preserve the water supply, because of the expected runoff and the consequent damage to the downstream property owners.

{¶ 34} Brown testified that he tried to maintain lower water levels in the fall and winter months for flood control. However, the city has not provided evidence of a written policy to keep the reservoirs at any set level or concerning when and under what circumstances the gated spillway would be opened. Neither the city nor Lawson explains why the reservoirs, which had apparently been designed to be self-regulating, and which had satisfied ODNR that they had sufficient spillway to pass a 100–year storm, needed a gated spillway to discharge water at a greater rate than the principal spillway or the emergency spillway. Nevertheless, Lawson and the city insist that the gated spillway is not a flood-control device.

{¶ 35} ARCADIS cautioned the city in an April 12, 2005 letter that "the City could incur liability if its interference with the flow of water causes damage to

other riparian properties, and that interference is found to be unreasonable." It further recommended that the city "implement such measures" at the Memorial reservoir necessary "to minimize erosion immediately downstream." It also makes clear that the city is prohibited from "interfering with the natural flow of surface water to the detriment of others."

## II. STANDARD OF REVIEW

{¶ 36} An appellate court reviews a summary-judgment decision de novo, applying the same standard used by the court below. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

{¶ 37} Summary judgment is appropriate when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, citing *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267; *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 117, 522 N.E.2d 489; Civ.R. 56(C).

## III. UNCONSTITUTIONAL TAKING

{¶ 38} In their first assignment of error, appellants maintain:

{¶ 39} "1. The trial court erred by dismissing the [appellants'] claims for an unconstitutional takings [sic] on the basis of governmental immunity."

{¶ 40} Appellants argue that the city substantially interfered with their use and enjoyment of their property by operating the reservoirs in a manner that caused their properties to flood during a period of heavy rainfall in June 2006 and frequently thereafter. Appellants assert that immunity cannot be the basis upon which the city's motion for summary judgment on the mandamus cause of action is granted, because their claim invokes the protections of the Fifth Amendment to the United States Constitution and Section 19, Article I of the Ohio Constitution.

■ {¶ 41} We agree that the rights that those provisions confer are not subject to the limitations of the Political Subdivision Tort Liability Act. See *Denune v. Springfield* (June 28, 2002), 2d Dist. No. 01CA0097, 2002-Ohio-3287, 2002 WL 1393687.

{¶ 42} Section 19, Article I of the Ohio Constitution provides as follows:

{¶ 43} "Private property shall ever be held inviolate, but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure, or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner."

{¶ 44} To establish through their mandamus action their right to the commencement of appropriations proceedings, appellants cite *Gabel v. Miami E. School Bd.*, 169 Ohio App.3d 609, 2006-Ohio-5963, 864 N.E.2d 102, ¶ 52, in which the Second Appellate District held, "[A] compensable taking is established if a landowner simply demonstrates a substantial or unreasonable interference with a property right. * * * This is particularly true in cases involving the physical invasion of private property through flooding caused by public improvements."

{¶ 45} The Supreme Court of Ohio has held in *Masley v. Lorain* (1976), 48 Ohio St.2d 334, 341, 2 O.O.3d 463, 358 N.E.2d 596, *Lucas v. Carney* (1958), 167 Ohio St. 416, 423, 5 O.O.2d 63, 149 N.E.2d 238, *Norwood v. Sheen* (1933), 126 Ohio St. 482, 186 N.E. 102, paragraph one of the syllabus, and *Lake Erie & W. RR. Co. v. Commrs. of Hancock Cty.* (1900), 63 Ohio St. 23, 57 N.E. 1009, paragraph three of the syllabus, that "[a]ny direct encroachment upon land, which subjects it to a public use that excludes or restricts the dominion and control of the owner over it, is a taking of his property, for which he is guaranteed a right of compensation by section 19 of the bill of rights."

{¶ 46} A taking need not be physical appropriation of the landowner's property. In the absence of a physical taking of property, a taking occurs only where there is a substantial interference with the rights of ownership of private property. *Smith v. Erie RR. Co.* (1938), 134 Ohio St. 135, 11 O.O. 571, 16 N.E.2d 310. Any such substantial interference with the rights of ownership of private property is deemed to be a taking pro tanto. *J.P. Sand & Gravel Co. v. State* (1976), 51 Ohio App.2d 83, 89–90, 5 O.O.3d 239, 367 N.E.2d 54.

{¶ 47} To establish a taking, the landowner must prove that the state entity caused a "substantial or unreasonable interference with [his] property right[s]." *State ex rel. OTR v. Columbus* (1996), 76 Ohio St.3d 203, 206, 667 N.E.2d 8. This right is applicable even when the owner is only partially deprived of the uses of his land. The rationale behind recognizing a pro tanto taking is that the act of depriving an owner of any valuable use of his land is the equivalent of depriving him of his land. Id. at 207. The issue in a taking is not whether the public entity acted negligently or contrary to its authority. Rather, the issue is

solely whether the landowner was deprived of an economically valuable use of his property as a consequence of governmental action. *Masley,* 48 Ohio St.2d at 341, 2 O.O.3d 463, 358 N.E.2d 596, and *Carney,* 167 Ohio St. at 423, 5 O.O.2d 63, 149 N.E.2d 238.

{¶ 48} The city does not dispute that the trial court erred in dismissing appellants' complaint for a writ of mandamus on the basis of governmental immunity. See *State ex rel. Levin v. Sheffield Lake* (1994), 70 Ohio St.3d 104, 108, 637 N.E.2d 319.

{¶ 49} The Supreme Court of Ohio has long recognized mandamus as the proper vehicle for instituting appropriation proceedings against a public authority. See *State ex rel. McKay v. Kauer* (1951), 156 Ohio St. 347, 46 O.O. 204, 102 N.E.2d 703, paragraph three of the syllabus; *Wilson v. Cincinnati* (1961), 172 Ohio St. 303, 306–307, 16 O.O.2d 71, 175 N.E.2d 725. A writ of mandamus is an order to a public officer or entity to perform an act that the law specifically imposes upon the officer or entity as a duty. R.C. 2731.01. "[M]andamus is the vehicle for compelling appropriation proceedings by public authorities where an involuntary taking of private property is alleged." *State ex rel. Levin* at 108.

{¶ 50} Similarly, in *Coles v. Granville* (C.A.6, 2006), 448 F.3d 853, 861–863, the Sixth Circuit Court of Appeals held that pursuant to R.C. 163.01 through 163.62 and 2737.01, a party may seek a writ of mandamus to compel a public official to bring an appropriation action because of the taking of private property for a public purpose.

{¶ 51} In a mandamus action, it is for the trial court, as the trier of fact and law, to determine whether there was a pro tanto taking of the owner's property without compensation. The test is whether the state entity caused a "substantial or unreasonable interference with [his] property right[s]." *State ex rel. OTR,* 76 Ohio St.3d at 206, 667 N.E.2d 8. See *State ex rel. Merritt v. Linzell* (1955), 163 Ohio St. 97, 56 O.O. 166, 126 N.E.2d 53; *State ex rel. McKay,* 156 Ohio St. 347, 46 O.O. 204, 102 N.E.2d 703; *Akron–Selle Co. v. Akron,* 49 Ohio App.2d 128, 130, 3 O.O.3d 186, 359 N.E.2d 704. The court exercises judicial discretion, based upon all the facts and circumstances in the case and the justice to be done, when considering whether to allow or deny the writ. *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631, paragraph seven of the syllabus.

{¶ 52} To obtain a writ of mandamus, one must demonstrate " 'that the relator has a clear legal right to the relief prayed for, that the respondent is under a clear legal duty to perform the requested act, and that relator has no plain and adequate remedy at law.' " *State ex rel. Bd. of Edn. of Middletown City School Dist. v. Butler Cty. Budget Comm.* (1987), 31 Ohio St.3d 251, 253, 31 OBR

455, 510 N.E.2d 383, quoting *State ex rel. Westchester Estates, Inc. v. Bacon* (1980), 61 Ohio St.2d 42, 15 O.O.3d 53, 399 N.E.2d 81, paragraph one of the syllabus. See R.C. 2731.05. See also *State ex rel. Burch v. Sheffield–Sheffield Lake City School Dist. Bd. of Edn.* (Apr. 19, 1995), 9th Dist. No. 94CA005832, 1995 WL 230892.

{¶ 53} The city concedes that the trial court may have erred in dismissing appellants' taking claim on immunity grounds, but advances three arguments in support of its claim that it still is entitled to summary judgment: (A) appellants' properties have not been appropriated, (B) the claim is barred by the statute of limitations, and (C) the doctrine of standing precludes appellants from recovering compensation in an appropriation proceeding.

A. The city claims that appellants' properties have not been appropriated

{¶ 54} The city claims that appellants' properties have not been appropriated. The city maintains that because the natural flow of Norwalk Creek was not altered by the addition of the reservoirs or the Benedict Avenue Bridge, it cannot be held liable for the public improvements and the resulting injury to the appellants. The city maintains that even if the use of the gated spillway was a proximate cause of the flooding, it is not liable to downstream property owners because its conduct was not unreasonable and appellants' properties are located in a flood plain.

{¶ 55} The city argues that this case is distinguishable from prior court cases involving public improvements, including *Masley,* 48 Ohio St.2d 334, 2 O.O.3d 463, 358 N.E.2d 596, because the construction and operation of the reservoirs and the construction of the Benedict Avenue Bridge did not have the "effect of producing or casting the waters onto Plaintiffs' properties." The city insists that "naturally occurring floodwaters which overflow a natural waterway that happens also to be used as a source for municipal water supply" cannot result in a taking.

{¶ 56} According to appellants, the city's behavior before, during, and after the June 2006 flood reflects a lack of consideration for the well-being of downstream landowners, particularly property owners on Elm Street adjoining Norwalk Creek. The city's statement that the natural flow of Norwalk Creek has not been altered by the reservoirs or the Benedict Street Bridge are contradicted by Haag, who points out the multiple ways the once-natural system has been engineered and altered. Haag also argues specifically that the decision to open the gated spillway increased the rate at which water was flowing into Norwalk Creek, causing it to flood.

{¶ 57} Although appellants live in a flood zone, Haag insists that they have suffered more severe and repeated flooding since June 2006. Haag points to the age of appellants' homes, built between 1900 and 1950, and the lack of repeated

flooding prior to 2006 as evidence of the city's negligence in the recent operation of its reservoirs. Appellants also testified that flooding since 2006 has been more frequent and severe.

{¶ 58} In *Masley v. Lorain,* 48 Ohio St.2d 334, 2 O.O.3d 463, 358 N.E.2d 596, syllabus, the Supreme Court of Ohio recognized that flooding caused by construction of municipal storm sewers gives the landowner whose use or enjoyment of property has been diminished "a right to compensation for the property taken under Section 19, Article I of the Ohio Constitution."

{¶ 59} In *Masley,* the city of Lorain was held responsible for the flooding of plaintiffs' land because it had effectively appropriated the plaintiffs' property by constructing a storm-sewer system that channeled a larger volume of water into the creek than the creek could reasonably be expected to handle without flooding. The court remarked:

{¶ 60} "It would be anomalous indeed to hold that a municipality may plan and build a storm sewer system to collect surface water and channel it into a natural watercourse, with knowledge that the watercourse is insufficient to accommodate the flow during rains which can be reasonably anticipated, and thereby cause continual flooding of lower land, without compensation to the owner, despite the municipality's liability for causing surface water to flood the property directly, and its liability for failure to use reasonable care in its construction of a hydraulic system in order to prevent injury to others in times of flooding. This anomaly is particularly apparent where, as here, a different design would have averted the flooding."

{¶ 61} Prior to *Masley,* the Supreme Court of Ohio in *Piqua v. Morris* (1918), 98 Ohio St. 42, 120 N.E. 300, paragraph two of the syllabus, held:

{¶ 62} "In the construction and maintenance of a hydraulic, or similar work, a municipality, or other owner, is required to use ordinary skill and foresight to prevent injury to others in times of floods to be reasonably anticipated; and if injury is caused by the negligence of such owner, he is liable in damages, provided his negligence is one of the proximate causes of the injury, although it concurred with other causes, including the act of God."

{¶ 63} The central issue in this assignment of error is whether appellants' properties were in fact physically appropriated by the city. Instructive is *State ex rel. Post v. Speck,* 3d Dist. No. 10–2006–001, 2006-Ohio-6339, 2006 WL 3477024, in which the Third Appellate District concluded that property owners downstream of Grand Lake St. Mary's were entitled to a writ of mandamus compelling ODNR to initiate appropriation procedures regarding the taking of appellees' properties.[4] In *Post,* the court held,

{¶ 64} "Federal law clearly holds that if ' * * * the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value, there is a taking within the scope of the 5th Amendment.' [*United States*] *v. Lynah* (1903), 188 U.S. 445, 470, 23 S.Ct. 349, 47 L.Ed. 539, reversed in part on other grounds by [*United States* ] *v. Chicago, M., St. P. & P.R. Co.* (1941), 313 U.S. 543, 598, 61 S.Ct. 772, 85 L.Ed. 1064. The taking claim requires that ' * * * a servitude must have been imposed upon the land, that is to say, a subjection of the land for a more or less definite time to a use inconsistent with the rights of the owner.' *North Counties Hydro–Electric Co. v. United States* (1947), 108 Ct.Cl. 470, 485, 70 F.Supp., 900, 903. Anything less than this circumstance may give rise to an action for damages in a tort action, but the action of the government will not constitute a taking. *Sanguinetti v. United States* (1924), 264 U.S. 146, 147, 44 S.Ct. 264, 68 L.Ed. 608, and *Barnes v. United States* (1976), 210 Ct.Cl. 467, 538 F.2d 865, 870.

{¶ 65} "The flooding servitude can arise either from constant flooding or from intermittent, frequent, and inevitably recurring flooding. In the latter case, the government has taken a flowage easement over the private land and must pay just compensation for the taking pursuant to the Constitution. *Baird v. United States* (1984), 5 Cl.Ct. 324, 328. While the flooding can be intermittent, it must still be an inevitable and recurring event caused by the natural and probable consequences of governmental action. *Barnes v. United States*, supra at 870–871, citing *United States v. Cress* (1917), 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746. The longer the time between the flooding episodes, the less likely the circumstances will result in a taking. *Fromme v. United States* (1969), 188 Ct.Cl. 1112, 412 F.2d 1192, 1197 (flooding every 15 years was not enough to establish a taking). The permanent or inevitably-recurring requirement satisfies the intent element of a taking. *Turner v. United States* (1989), 17 Cl.Ct. 832, 835–836, reversed on other grounds by (1990), 901 F.2d 1093." *Post,* 3d Dist. No. 10–2006–001, 2006-Ohio-6339, 2006 WL 3477024, at ¶ 57–58.

{¶ 66} In this case, as in *Post,* appellants are required to prove that the city "caused an increase in the extent of and duration of the flooding by installing the new spillway, the flooding increase resulted in damage * * * sufficient to establish a taking rather than tortuous damages, and that the increased flooding is permanent or will frequently and inevitably recur." Id. at ¶ 60.

{¶ 67} In *Post,* the court noted that "Flooding issues are very complex matters and therefore, generally, require the use of expert testimony to prove the cause

---

4. Peter M. Handwork, Mark L. Pietrykowski, and Arlene Singer, sitting in the Third Appellate District by assignment.

and frequency of flooding. Compare, *Baskett et al. v. United States* (1985), 8 Cl.Ct. 201, 225–226." Id. at ¶ 61.

{¶ 68} In this case, appellants maintain that the city failed to consider known flood risks when it constructed the reservoirs and signed off on the construction of the Benedict Avenue Bridge, failed to consult with engineers concerning the operation of the reservoirs and the gated spillway, and was substantially aware that its conduct would likely increase the risk of flooding for the property owners along Elm Street.

{¶ 69} The trial court's judgment entry did not specifically address whether there was a taking. Because genuine issues of material fact exist concerning whether an appropriation of appellants' land has occurred due to the design and operation of the reservoirs, the mandamus action must be remanded to the trial court for consideration of whether there was a taking.

B. Statute of Limitations

{¶ 70} The city contends that the statute of limitations in an appropriation action is six years and asserts that the time began to run when the last of the improvements were made to the reservoirs in 1963, when the gated spillway was added. Appellants agree that the statute of limitations is six years, but disagree with the city that the injury occurred when the last modification was made to the reservoirs in 1963. Appellants argue that they did not experience "frequent and severe" flooding until June 2006, and they argue that their injury occurred on that date. Before the trial court can consider whether appellants' claim is barred by the statute of limitations, it must determine the date of injury. Thus, the statute-of-limitations argument must be litigated in the trial court on remand.

C. Doctrine of Standing

{¶ 71} The city argues that the doctrine of standing precludes appellants from recovering compensation in an appropriation proceeding. The city asserts that none of the appellants owned their properties when the last modification to the reservoirs was made in 1963. Therefore, the city contends that appellants lack standing to prosecute the action.

{¶ 72} In the context of appropriation proceedings, Ohio has followed the substantive rule that "[i]f the injury [is] permanent at the time of the completion of the structure, the owner at that time has a cause of action which is not assignable and does not pass to the grantee." *Hatfield v. Wray* (2000), 140 Ohio App.3d 623, 628, 748 N.E.2d 612.

{¶ 73} The city argues that the injury to appellants, as in *Hatfield,* occurred as the result of a permanent construction that was complete long before appellants

took title to their properties.  The city also claims that appellants were aware that their property was located within a flood zone at the time they purchased it.

{¶ 74} Appellants argue, however, that the injury did not occur until June 2006, when the city, primarily as a result of its operation of the sluice gates, caused their properties to flood.  If the injury occurred in June 2006, appellants would have standing because they owned their properties when the appropriation and injury occurred.

{¶ 75} In *Steinle v. Cincinnati* (1944), 142 Ohio St. 550, 555, 27 O.O. 488, 53 N.E.2d 800, the Supreme Court of Ohio held, "Such right of action as there might have been under the appropriation theory would have belonged to the one who owned the property when the appropriation and injury happened."

{¶ 76} The trial court did not consider nor rule on when the injury to appellants occurred, thus it did not determine whether appellants have standing.

{¶ 77} We agree that appellants may be entitled to a determination of compensation due in accordance with constitutional requirements.  However, the trial court must initially determine whether appellants' properties have been appropriated.  Only then would the city commence appropriation proceedings. *State ex rel. Levin v. Sheffield Lake* (1994), 70 Ohio St.3d 104, 108, 637 N.E.2d 319.

{¶ 78} Appellants' first assignment of error is well taken.  Governmental immunity is not a legal basis for dismissing the appellants' mandamus action; there are issues of fact regarding whether there has been a taking, whether the statute of limitations has run, and whether appellants have standing.

## IV.  FINDINGS UNSUPPORTED BY THE RECORD

{¶ 79} In their second assignment of error, appellants maintain:

{¶ 80} "2. The trial court erred in making findings of fact which have no support in the record."

{¶ 81} We agree.

{¶ 82} We note that the trial court relied primarily upon the expert reports of Haag and Lawson in making its findings of fact.  It is clear that the parties offer conflicting opinions regarding every aspect of the management of the reservoirs.

{¶ 83} It appears that the trial court rendered its judgment on its own conclusions regarding the credibility of the parties' experts in making its findings of fact.  However, the trial court erred in doing so, since a "[r]esolution of a motion for summary judgment does not include trying the credibility of witnesses." *Killilea v. Sears, Roebuck & Co.* (1985), 27 Ohio App.3d 163, 167, 27 OBR 196, 499 N.E.2d 1291.

{¶ 84} "Summary judgment is a procedural device for terminating litigation which, if permitted to run its full course, would leave nothing for the trier of fact to resolve. As stated with stark simplicity in Rule 56(C), Rules of Civil Procedure, the scope of the court's inquiry at this stage is narrowly confined to whether there is any genuine issue of material fact. The court cannot try any issues of fact, except insofar as it is required to view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion. *American Mfrs. Mut. Ins. Co. v. American Broadcasting–Paramount Theatres, Inc.* (2d Cir.1967), 388 F.2d 272, 279." *Duke v. Sanymetal Prods. Co.* (1972), 31 Ohio App.2d 78, 83, 60 O.O.2d 171, 286 N.E.2d 324.

{¶ 85} "If an issue is raised on summary judgment, which manifestly turns on the credibility of the witness because his testimony must be believed in order to resolve the issue, and the surrounding circumstances place the credibility of the witness in question—for example, where the potential for bias and interest is evident—then, the matter should be resolved at trial, where the trier of facts has an opportunity to observe the demeanor of the witness." Id.

{¶ 86} Although the parties' experts rely on the same hydraulic and hydrologic principles, they offer competing claims regarding the application of those principles to the Norwalk Creek flooding. The competing evidence from both parties' experts regarding hydraulic principles, the flow of Norwalk Creek, and the operation of the reservoirs should be considered at trial, not through summary judgment.

{¶ 87} The second assignment of error is well taken.

## V. ROUTINE MAINTENANCE DECISIONS

{¶ 88} In their third and fourth assignments of error, appellants maintain:

{¶ 89} "3. The trial court erred in finding that the discretionary defense in [R.C.] 2744.03(A)(3) applies to routine maintenance decisions.

{¶ 90} "4. The trial court erred in finding that the discretionary defense in [R.C] 2744.03(A)(5) applies to routine maintenance decisions."

{¶ 91} We consider both assignments of error together. Appellants contend that the trial court erred in granting summary judgment to the city on their negligence, trespass, and nuisance claims because genuine issues of material fact remain regarding the city's claim for immunity under R.C. 2744.03(A)(3) or (5).

{¶ 92} We agree.

{¶ 93} The city is a political subdivision entitled to immunity from civil liability pursuant to R.C. Chapter 2744. *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, 780 N.E.2d 543, ¶ 10, citing *Cater v. Cleveland*

(1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610. However, R.C. 2744.02(B)(2) provides that "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions." See R.C. 2744.02(A)(1); *Hubbard* at ¶ 10. The operation of a municipal corporation water-supply system is a "proprietary function." *Hill v. Urbana* (1997), 79 Ohio St.3d 130, 679 N.E.2d 1109, paragraph two of the syllabus.

{¶ 94} Appellants may challenge the operation or maintenance of the city's water system under R.C. 2744.01(G)(2)(c). Negligent operation of its water system is an actionable proprietary function. However, the trial court concluded that R.C. 2744.03(A)(3) and (5) provide the city with a defense to liability.

{¶ 95} The city argues R.C. 2744.03(A)(3) and (5) together, as if they relate to the same kind of activity, stating that "these are exactly the kind of discretionary decisions concerning policy making or use of City facilities for which immunity is reinstated under R.C. 2744.03(A)(3) and (5)." However, each subsection must be considered separately.

A. Application of R.C. 2744.03(A)(3)

{¶ 96} R.C. 2744.03(A) provides:

{¶ 97} "The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee."

{¶ 98} According to the trial court, the city's decision not to open the gated spillway in advance of the June 2006 storm and to maintain a certain water level was within the discretion of the employee with respect to policy making or planning and is a defense to liability under R.C. 2744.03(A)(3).

{¶ 99} The trial court addressed the immunity granted to the city under R.C. 2744.03(A)(3) by noting that the city did not open the gated spillway in advance of the June 2006 storm because "it needed to maintain a certain level in the reservoir in order to provide water to its residents." This justification by the city constitutes a "reasonable use" argument under riparian law.

{¶ 100} Ohio has adopted a reasonable-use rule with respect to water runoff. *McGlashan v. Spade Rockledge Terrace Condo Dev. Corp.* (1980), 62 Ohio St.2d 55, 60, 16 O.O.3d 41, 402 N.E.2d 1196. "[A] possessor of land is not unqualifiedly privileged to deal with surface water as he pleases, nor absolutely prohibited from interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make a reasonable use of his land,

even though the flow of surface waters is altered thereby and causes some harm to others[.] [He] incurs liability only when his harmful interference with the flow of surface water is unreasonable." Id. at syllabus. Reasonableness, however, must be determined by analysis of the facts of a case, not as a matter of law. Id. at 60.

{¶ 101} The city had constructive knowledge of the potential for flooding along Elm Street, and appellants claim that the absence of a policy or plan for controlling the flow of water from the reservoirs is evidence of its negligence. According to appellants, the city had been forewarned of the potential for flooding but chose "to concern itself with the supply of water to its inhabitants and not consider the risks it is posing for downstream residents."

{¶ 102} Appellants maintain that there is no evidence that discretion exercised by any city employee resulted in a policy or plan. Appellants insist that the decision to open the gated spillway was a "choice made in the daily operations of a proprietary function" and is not a discretionary function of the political subdivision as defined by R.C. 2744.03(A)(3).

{¶ 103} The city suggests that immunity attaches for governmental functions and for discretionary decisions of its proprietary functions. The city claims that its "lack of flood control measures" is a governmental function under R.C. 2744.01(C)(2)(r). There is, however, a significant difference between a municipality that undertakes flood-control measures with immunity even if those measures fail, and a municipality that controls the flow of water through a water-supply system while failing to develop a plan or policy to prevent injury to others, i.e., flood-control measures. See *Piqua*, 98 Ohio St. 42, 120 N.E. 300. It is instructive to note that the absence of flood-control measures or planning could have been codified, but was not. Where R.C. 2744.01(C)(2)(*l*) specifies as a government function, "the provision or *nonprovision*, planning or design, construction, or reconstruction of a public improvement," R.C. 2744.01(C)(2)(r) specifies only "[f]lood control measures." (Emphasis added.)

{¶ 104} We reject the city's characterization that appellants are faulting the design or construction of the city's water system (i.e., reservoirs). Instead, we interpret appellants' complaint and argument as suggesting that the city's operation and maintenance of the water system under R.C. 2744.01(G)(2)(c) was negligent.

{¶ 105} The city has not shown that the operation of the gated spillway was a discretionary judgment in policy-making, planning, or enforcement, since it has presented no policy or plan resulting from actions taken to operate the gated spillway. The plain language of the statute requires us to consider policy-making

and planning to be intellectual activities that result in documentation for future use. The city has provided no such evidence of a policy or plan.

{¶ 106} In *Howe v. Jackson Twp. Bd. of Trustees* (1990), 67 Ohio App.3d 159, 162, 586 N.E.2d 217, this court addressed the application of R.C. 2744.03(A)(3), observing that it essentially codifies the ministerial/discretionary test formulated by the Supreme Court of Ohio in *Enghauser Mfg. Co. v. Eriksson Engineering, Ltd.* (1983), 6 Ohio St.3d 31, 6 OBR 53, 451 N.E.2d 228. According to *Howe,* "[t]he Political Subdivision Tort Liability Act [which codified R.C. 2744.03(A)(3)] was designed to re-establish a limited sovereign immunity defense in Ohio somewhat broader than that available under the judicially created doctrine." Id. The fundamental principle behind the ministerial/discretionary test is "whether the acts concern the 'essence of governing.'" Id., quoting *Enghauser Mfg. Co.* at 35. In *Enghauser,* the court concluded that "those functions which rest on the exercise of judgment and discretion and represent planning and policy-making" are separate from "those functions which involve the implementation and execution of such governmental policy or planning." Id. Further, to constitute a basic policy-making decision, an exercise of judgment should involve the weighing of fiscal priorities, safety, and engineering considerations. *Williamson v. Pavlovich* (1989), 45 Ohio St.3d 179, 185, 543 N.E.2d 1242. Once a decision is made, however, the government entity still can be liable for the negligent implementation of its decision. *Enghauser Mfg. Co.* See *Winwood v. Dayton* (1988), 37 Ohio St.3d 282, 525 N.E.2d 808.

{¶ 107} As to R.C. 2744.03(A)(3), the issue is whether any actions of city employees involved policy-making, planning, or enforcement powers. Key evidence for this would be an established policy or protocol that resulted from the actions of city employees. Because the city has not presented such documentation, appellants' argument is well taken.

B. Application of R.C. 2744.03(A)(5)

{¶ 108} R.C. 2744.03(A)(5) provides:

{¶ 109} "The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 110} The trial court concluded that because the decision to open the gated spillway following the record rainfall was "an exercise of judgment in determining how to use the facilities of the reservoir," it falls within the exception to immunity set forth in R.C. 2744.03(A)(5). Accordingly, pursuant to that section, the trial

court concluded that the city was immune from liability, stating that appellants have not presented evidence that the city had acted with malicious purpose, in bad faith, or in a manner that was wanton or reckless.

{¶ 111} Appellants argue that questions of fact exist as to whether the city employees were reckless in opening the gated spillway at the time they did. The city contends that Haag "could identify no specific evidence of any day-to-day failures in the upkeep of the system," a statement appellants claim was taken out of context. Although not pointed out by either party, the city has suggested that its actions during times of flooding amount to policy-making and planning, leaving only the "maintenance" of the system for consideration under R.C. 2744.03(A)(5). Appellants, however, contend that the city lacks any policy or planning for the water flowing out of the reservoirs and that the specific discretionary actions taken during the June 2006 flood were done in a reckless manner.

{¶ 112} In *Keytack v. Warren*, 11th Dist. No. 2005–T–0152, 2006-Ohio-5179, 2006 WL 2796506, ¶ 37, the court rejected the premise that R.C. 2744.03(A)(5) provides an employee with immunity from liability even when there exists a genuine issue of material fact as to whether the city of Warren was negligent. Further, in *Keytack*, appellee's amended complaint alleged that the city of Warren acted in a "wanton and reckless" manner in failing to maintain the storm sewer in question. The court in *Keytack* held that appellant may not premise its immunity argument in R.C. 2744.03(A)(5).

{¶ 113} Similarly, in *Hacker v. Cincinnati* (1998), 130 Ohio App.3d 764, 770, 721 N.E.2d 416, the First Appellate District held that "[i]f a plaintiff's injuries stem from a political subdivision's negligent maintenance or operation of a structure under its control, then the political subdivision will not be immune from liability." See *McVey v. Cincinnati* (1995), 109 Ohio App.3d 159, 671 N.E.2d 1288. *Hacker* held that a political subdivision can not simply assert that all its decisions are discretionary in order to obtain protection under R.C. 2744.03(A)(5). "To hold otherwise would be construing the grant of immunity under the Political Subdivision Tort Liability Act more broadly than we believe the legislature originally intended." *Hacker* at 771. See *Hall v. Fort Frye Local School Dist. Bd. of Edn.* (1996), 111 Ohio App.3d 690, 699, 676 N.E.2d 1241; *Kiep v. Hamilton* (May 19, 1997), 12th Dist. No. CA96–08–158, 1997 WL 264236.

{¶ 114} In this case, the city asserts that discretion would be involved in almost any actions of city employees, including a situation in which a city employee, engaged in a proprietary function, negligently opened the gated spillway. In the city's view, such an act—opening the gated spillway—would be "discretionary." Thus, R.C. 2744.03(A)(5) would afford the city a complete grant of immunity unless the act was performed in a willful or wanton manner. We find that a public entity should not be able to gain protection under R.C. 2744.03(A)(5)

simply by asserting that its actions in operating a water-supply system were discretionary. *Doud v. Cincinnati* (1949), 152 Ohio St. 132, 137, 39 O.O. 441, 87 N.E.2d 243. See *Piqua*, 98 Ohio St. 42, 120 N.E. 300, at paragraph two of the syllabus; *Carney*, 167 Ohio St. at 423, 5 O.O.2d 63, 149 N.E.2d 238; *Barberton v. Miksch* (1934), 128 Ohio St. 169, 171, 190 N.E. 387.

{¶ 115} In *Hall v. Ft. Frye Local School Dist. Bd. of Edn.* (1996), 111 Ohio App.3d 690, 699, 676 N.E.2d 1241, the court observed: "Immunity operates to protect political subdivisions from liability based upon discretionary judgments concerning the allocation of scarce resources; it is not intended to protect conduct which requires very little discretion or independent judgment. The law of immunity is designed to foster freedom and discretion in the development of public policy while still ensuring that implementation of political subdivision responsibilities is conducted in a reasonable manner." See *Hubbell v. Xenia*, 175 Ohio App.3d 99, 2008-Ohio-490, 885 N.E.2d 290, ¶ 18, quoting *Addis v. Howell* (2000), 137 Ohio App.3d 54, 60, 738 N.E.2d 37 (" 'Some positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to an object to be achieved is required in order to demonstrate an exercise of discretion for which R.C. 2744.03(A)(5) confers immunity from liability on a political subdivision' "). In *McVey*, the court observed that "[i]mmunity attaches only to the broad type of discretion involving public policy made with 'the creative exercise of political judgment.' " Id., 109 Ohio App.3d at 163, 671 N.E.2d 1288, quoting *Bolding v. Dublin Local School Dist.* (June 15, 1995), 10th Dist. No. 94APE09–1307, 1995 WL 360227. Further, "[i]mmunity does not apply to the negligence of employees in 'the details of carrying out the activity even though there is discretion in making choices.' " Id. Once a decision is made, however, the government entity still can be liable for the negligent implementation of its decision. *Enghauser Mfg. Co.*, 6 Ohio St.3d at 32, 6 OBR 53, 451 N.E.2d 228. See *Winwood v. Dayton* (1988), 37 Ohio St.3d 282, 525 N.E.2d 808.

{¶ 116} Appellants assert that the city's employees were reckless in opening the gated spillway and releasing additional water into Norwalk Creek when the ungated spillway was being overtopped, even though the water in the reservoir had not yet overtopped the emergency spillway and the rains were abating.

{¶ 117} The city contends that it had to open the gated spillway because the reservoirs were overflowing and the county engineer was concerned that the force of the water flowing from the spillway would threaten the structural integrity of a bridge on Old Stone Road near the reservoir. The city also contends that there is no evidence that its employees' discretionary decisions were made with "malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 118} The absence of any action by the city to develop a policy or plan for the operation and maintenance of the water system may be a violation of its obligation to "use ordinary skill and foresight to prevent injury to others in times of floods to be reasonably anticipated." *Piqua*, 98 Ohio St. 42, 120 N.E. 300, at paragraph two of the syllabus. The city's decisions not to reduce the water level in the reservoirs prior to the storm and to open the gated spillway at that particular time were not based on any policy or plan that took into consideration competing interests, and may be reckless.

{¶ 119} The city has not provided evidence that it used ordinary skill or foresight to prevent injury to the downstream property owners. Instead, the gated spillway was opened ostensibly to reduce the impact of the water cascading down the ungated spillway into the Old Stone Road bridge structure. The city lacks evidence that this technique was one that was considered prior to the event. Nor does the city present evidence that it considered the technique's consequence on downstream properties.

{¶ 120} Appellants assert that the city's operation of the gated spillway was reckless. Appellants have established that the city knew that opening the gated spillway could cause flooding downstream. Because the city's decision was not a considered choice between two alternatives, involving a weighing of the relative risks, the city's decision could be considered perverse.

{¶ 121} Thus, a genuine issue of material fact exists as to whether the decision to open the gated spillway was made "in a wanton or reckless manner." The city is not entitled to summary judgment because of immunity on appellants' negligence, trespassing, and nuisance claims.

## VI.   UNCONSTITUTIONAL TAKINGS CLAIM

{¶ 122} In their fifth assignment of error, appellants maintain:

{¶ 123} "5. The trial court erred in not granting [appellants'] Motion for Summary Judgment on the unconstitutional takings claim."

{¶ 124} As stated earlier, we specifically decline to review this assignment of error because "[a]n order denying a motion for summary judgment is not a final appealable order." *State ex rel. Overmeyer v. Walinski*, 8 Ohio St.2d at 23, 37 O.O.2d 358, 222 N.E.2d 312.

{¶ 125} Accordingly, we find appellants' fifth assignment of error not well taken.

## VII.   NUISANCE AND TRESPASS CLAIM

{¶ 126} In their sixth assignment of error, appellants maintain:

{¶ 127} "6. The trial court erred in not granting [appellants'] Motion for Summary Judgment on the nuisance and trespass claim."

{¶ 128} Again, we need not address this assignment of error because "[a]n order denying a motion for summary judgment is not a final appealable order." Id.

{¶ 129} Accordingly, we find appellants' sixth assignment of error not well taken.

## VIII. CONCLUSION

{¶ 130} We conclude that the city is a political subdivision subject to sovereign immunity. However, this case involves a proprietary function, and none of the immunity defenses to liability under R.C. 2744.03(A)(3) and (5) apply. Therefore, the city is not entitled to summary judgment as a matter of law as to appellants' claims for negligence, trespass, and nuisance.

{¶ 131} We further find that the trial court erred in holding that the immunity defenses extended to appellants' writ of mandamus. The trial court must determine whether the city appropriated appellants' properties.

{¶ 132} Therefore, based upon the foregoing, the judgment of the Huron County Common Pleas Court is reversed. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

PIETRYKOWSKI and SINGER, JJ., concur in judgment only.

